James A. LANCASTER et al., Plaintiffs,

v.

CITY OF COLUMBUS et al., Defendants.

W. N. HAGGARD et al., Plaintiffs,

v.

James A. LANCASTER et al., Defendants.

Nos. EC 7059, EC 7075.

United States District Court,
N. D. Mississippi, E. D.

Nov. 8, 1971.

DeWitt T. Hicks, Jr., Hunter M. Gholson, Robert B. Prather, Columbus, Miss., for Lancaster, and others.

J. O. Sams, Jr., Columbus, Miss., for Housing, Inc.

Falton O. Mason, Asst. U. S. Atty., for HUD.

G. Lowrey Lucas and Dixon L. Pyles, Jackson, Miss., William J. Threadgill, Billy J. Jordan, Columbus, Miss., for Haggard, and others.

Thomas J. Tubb, West Point, Miss., and Thomas C. Harvey, Jr., Columbus, Miss., for City of Columbus.

## MEMORANDUM OPINION

KEADY, Chief Judge.

These consolidated cases involve the legality of a low-income rental housing project planned for a 4.09 acre parcel of land owned by James A. Lancaster (Lancaster) adjacent to the city-owned Lee Park in Columbus, Mississippi, as well as the validity of an agreement for mortgage insurance to finance its construction made by the Secretary of Housing and Urban Development (HUD), through his statutory agent, Federal Housing

Commissioner (FHA), under §· 236 of the National Housing Act, 12 U.S.C. § 1715z–1.

This litigation began in state court on July 1, 1970, when a group of private property owners (homeowners) [1] sought to enjoin Lancaster,[2] Housing, Inc., principal subcontractor, and Bailey Mortgage Company, mortgagee, from using a portion of Lee Park for access to the building site, and compel the City of Columbus to cancel the municipal building permit which it had issued for the housing project. By amended pleadings, HUD was joined as a party defendant to the action. Before any hearing in state court, HUD on September 9 removed the case to federal district court, where it was docketed as EC 7075–K. Denying homeowners' motion to remand, this court upheld removal jurisdiction under 28 U.S.C. § 1442(a) (1). Haggard v. Lancaster, 320 F.Supp. 1252 (N.D.Miss. 1970).

Prior to the removal of the above action, Lancaster and Housing, Inc., had on July 24 brought an action in federal district court, No. EC 7059–K, seeking injunctive relief against the homeowners who were allegedly physically blocking access to the building site, and against the City which was attempting to revoke the building permit. The federal suit claimed damages against all defendants for unlawful conspiracy and denial of equal protection of the laws, under 42 U.S.C. §§ 1983 and 1985(3), and damages for delaying the construction project. A preliminary injunction sought by Lancaster and Housing, Inc., was denied on July 29 because of the pendency of the previously filed action in state court. We overruled the motions to dismiss by the City and homeowners, deferring action in the federal case until resolution of the state claims raised by the state court action.[3] Subsequently, when this court took jurisdiction of the state action upon removal, the two causes were consolidated for trial and thereafter treated as one action.

Lancaster, Housing, Inc., and Bailey Mortgage Company on October 16 again applied for a preliminary injunction, alleging that the City was proceeding to zone the Lancaster property for single-family residential use only and the homeowners had continued to physically block access to the construction site 24 hours each day in an effort to prevent construction from commencing before the enactment of a city zoning ordinance. This court issued a preliminary injunction against Lancaster, Housing, Inc., and the City to preserve the status quo of their respective positions and prevent prejudice accruing to either side because of the court's inability to give an expedited hearing on the merits. By this injunction Lancaster, Housing, Inc., Bailey Mortgage Company and HUD were enjoined from making use of Lee Park and further carrying on construction at the site until final determination of the cause, and the City was enjoined from declaring expired due to passage of time its building permit issued to Lancaster, or declaring Lancaster's proposed use of the property in conflict with any

---

1. The homeowners are: W. N. Haggard and wife, Otera Haggard, James A. Egger, Ralph L. Webb, Dorothy H. Dale, Louis B. Nabors, Sr., and wife, Elizabeth C. Nabors, J. H. Edmonson and wife, Mary Frances Edmonson, Mrs. D. D. Baugh, Robert Hardy and wife, Ann C. Hardy, Irwin D. Tate and wife, Anniette K. Tate, Joe A. McHarg and wife, Mrs. J. A. Harg, Mrs. Robert Ivy, James W. Eatherton and wife, Mrs. James W. Eatherton, J. W. Furr and wife, Mrs. J. W. Furr, Mrs. James T. Doster, Hinton Geer and wife, Mrs. Hinton Geer.

2. Margaret R. Lancaster, wife of James A. Lancaster, was also sued in her capacity as general contractor of the construction project and will be included in the reference to Lancaster, unless the context otherwise requires.

3. The initial dismissal of the City on the ground that it was not a "person" within the meaning of 42 U.S.C. § 1983 was later withdrawn by the court in view of the prayer for injunctive relief against the municipality. Harkless v. Sweeny Independent School District, 427 F.2d 319 (5 Cir. 1970); Hawkins v. Town of Shaw, 437 F.2d 1286 (5 Cir. 1971).

zoning ordinance thereafter adopted by the City.

HUD on November 2 moved to dismiss the complaint filed against it in the removed action for failure to state a claim upon which relief could be granted, which motion was denied on January 25, 1971. In joining issue, almost every party to the consolidated actions filed either amended or supplemental pleadings or entered cross-claims to adverse parties, including a counterclaim by the City against Lancaster for cancellation of the building permit and its tendering into the registry of the court a refund of the $738.50 building permit fee paid by Lancaster.

Following extensive discovery by both sides and pre-trial conferences, the court in March 1971 conducted a five-day evidentiary hearing, and after submission of excellent briefs, the case is now ripe for decision.

## I.

From voluminous evidence offered at the trial, the court finds the following essential facts. In 1912 Blewett Lee dedicated, in memory of his father, General Stephen Dill Lee, 24 acres of land to the City of Columbus "for the purposes of a public park only",[4] and retained a reversionary clause should the property or any part thereof "at any time cease to be used for the purposes of a public park or be used for a purpose other than those of a public park." The park property, located in the northern part of the City, was thereafter known as Lee Park. In 1916 Blewett Lee executed a supplemental conveyance to the City, also in memory of his father, for an additional strip of land 65 feet wide adjoining the north end of the original parcel; this supplemental conveyance, likewise containing a reverter clause, was executed for "the purposes of a public park of [sic] a right of way for a street car or traction railroad or of a public road or street only."[5] During the years following, residential neighborhoods built up on all sides of Lee Park, a hilly, wooded area in which there have been constructed tennis courts, picnic tables, huts for Boy Scout and Junior Auxiliary use, and generally maintained as an active public park. The City constructed within the confines of the park

4. The conveyance recites:
"To have and to hold the above described premises, with the appurtenances to the said party of the second part its successors and assigns but for the purpose of a public park only and upon the conditions that if the said premises, or any part thereof shall ever at any time cease to be used for the purposes of a public park or be used for a purpose other than those of a public park, or if any of the timber existing upon the said premises shall be cut down except for the purpose of laying out walks drives, or lawns thinning out excessive foliage, or otherwise beautifying the said premises the said property hereby conveyed shall revert to the party of the first part or his heirs as they case may be"

5. The language of the supplemental conveyance reads in part:
"To have and to hold the above described premises with the appurtenances to the said party of the second part its successors and assigns but for the purposes of a public park of [sic] a right of way for a street car or traction railroad or of a public road or street only and upon the condition that if any street car or traction company or companies shall desire to use the premises hereby conveyed or any part thereof for the purposes of a right of way to reach the said park it or they shall have the right to do so or if the County of Lowndes shall desire to use the premises hereby conveyed or any part thereof for a public road the said County shall have the right to do so or if the City of Columbus or any other municipality shall desire to use the premises hereby conveyed or any part thereof for a public street it shall have the right to do so but if the land hereby conveyed or any part thereof shall cease to be used for the purposes of a public park road street or right of way or if any of the timber existing upon the said premises shall be cut down except for the purposes of laying out a street car or traction right of way public road street or walk drives or lawns thinning out excessive foliage or otherwise beautifying the said premises or the purposes of access to the said part now known as Lee Park, the said property hereby conveyed shall revert to the party of the first part or his heirs as the case may be"

a drive or street known as Park Circle Drive, which traverses the area in a somewhat circular manner, connecting with three main arterial city streets, viz: on the south with 11th Street North, on the west with 7th Street North, and at the northeast corner with Military Road. Park Circle Drive was so laid out that a cul-de-sac extended across the western one-half portion of the above mentioned 65 foot strip of land, while the main park exit east to Military Road traversed the eastern one-half portion of the same strip; this eastern terminus, however, leaves park property and crosses private property to join Military Road. In 1948 the City paved this eastern terminus and levied a special assessment for curb, gutter and street paving against private property abutting Park Circle Drive from Military Road west to where the drive completely entered Lee Park. One of the private property owners so assessed was J. W. Eatherton, predecessor in title to a portion of Lancaster's plot. The City bore the remainder of the street improvement cost subject to certain exceptions not material to this case.

In 1967 Housing, Inc., acquired the 4.09 acre tract, which adjoins the northern boundary of Lee Park, by several purchases, from Eatherton and other owners. It caused to be prepared a plat of a proposed subdivision of 17 lots with a connecting access road from a cul-de-sac fronting the lots leading south to the property line, crossing park land and joining the north curb of the main east-west segment of Park Circle Drive.[6] On October 10, 1967, Ben Chilcutt, an officer of Housing, Inc., appeared before the Columbus municipal governing authorities to request approval of the Forest Glen Subdivision, which the City Council tentatively approved on condition that it complied with the requirements of the City's subdivision ordinance. That ordinance, in effect since November 23, 1965, prescribed in detail the procedure for securing plat approval.[7]

Housing, Inc., did not return to the Mayor and City Council to seek final approval of the subdivision or otherwise file plat, but nevertheless proceeded to construct the access street and cul-de-sac for its proposed subdivision and install water and sewer lines. After these outlays, Housing, Inc., determined that because of its considerable investment in the land, it was not feasible either to

6. Adair Cox, Housing, Inc.'s surveyor, also did engineering work for the City and knew that Housing, Inc.'s south line did not abut Park Circle Drive. He told Housing, Inc. the City's permission would have to be obtained to connect the street.

7. SECTION 1. PLAT REQUIRED. That it shall be unlawful for any person, firm or corporation to lay out a tract or parcel of land in the City of Columbus into two (2) or more building sites without first having the same surveyed and platted as hereinafter set forth by a registered civil engineer or land surveyor and a plat thereof filed for record as provided by law.

\* \* \* \* \*

SECTION 3. SURVEYS, STANDARDS, AND DESIGNS. In surveying the land to be platted, all lot corners shall be marked on the ground with iron pins.

\* \* \* \* \*

All subdivisions shall be surveyed and laid out in such a manner that each and every lot intended for sale shall face a public thoroughfare.

\* \* \* \* \*

SECTION 5. PROCEDURE TO SECURE PLAT APPROVAL. The owner or the engineer employed by him shall submit to the City Engineer a preliminary or penciled sketch of the proposed layout of any subdivision for consideration and tentative approval, after which the final survey shall be made and plats prepared and approved as herein set forth, showing street grades; design and layouts and grades of all utilities and drainage structures.

After the plat and survey has been completed, the same shall be submitted to the City Engineer for his approval, and then submitted to the Mayor and City Council, together with deposit of estimated costs of improvements, or equivalent bond or other equivalent security, or a proper petition as hereinabove set forth, if such petition is permitted by City, and if finally approved by the Mayor and City Council, the same shall bear a certificate thereof signed by the Mayor and Secretary-Treasurer. The original of said plat shall then be recorded in the office of the Chancery Clerk as provided by law.

sell the lots or otherwise proceed with its subdivision.[8]

In July 1969, a new City administration took office and called upon the City Planning Commission to give expedited consideration to a new subdivision regulation as well as a zoning ordinance for Columbus. The Planning Commission, which was set up by city ordinance, was empowered to study and recommend land use and comprehensive development for Columbus. This Commission, consisting of seven and later nine members appointed by the City Council, met regularly to discuss their duties; Lancaster was Commission chairman and Ben Chilcutt was a member. The proposed subdivision regulation was actively discussed by the Planning Commission at its September, October and November 1969 sessions, and on December 9 it was duly adopted by the Mayor and City Council as part of a comprehensive master plan for the City. Pertinent portions of the new regulation are set forth in the margin.[9] The Mayor and City Council also adopted in Decem-

8. Later, on December 2, 1969, Housing, Inc., applied for and obtained a building permit to construct a 16-unit apartment house on the property, but this project was abandoned because of inability to finance construction.

9. SECTION 106 PLAT REQUIRED
106.1 These regulations and development standards shall apply to the following forms of land subdivisions:
It shall be unlawful for any person, firm or corporation to layout for the purpose of selling, or offering for sale, a tract or parcel of land within the city *into two or more building sites without first having the tract or parcel of land surveyed and platted as hereinafter set forth by a Registered Professional Engineer or Licensed Land Surveyor and a plat thereof submitted to the City Planning Commission for its approval.* After approval by the Planning Commission, and City Engineer or other designated person, the plat shall be submitted to the Mayor and Council and, if approved, it shall be filed for record as provided by law with said Professional Engineer or Surveyor's signature and seal thereon. Before any plan, plat or replat of a subdivision or additions of land inside the corporate boundaries of Columbus, Mississippi shall be recorded with the Chancery Clerk of Lowndes County, it shall first be approved by the Planning Commission of the City of Columbus, in accordance with state statutes and the provisions of this ordinance. The filing of any plan, plat or replat without complying with the requirements of this ordinance shall be deemed a violation of the provisions of this ordinance.

SECTION 701 LARGE–SCALE DEVELOPMENT
701.2 *A comprehensive group housing development including the construction of two or more buildings together with the necessary drives and ways of access and* which is not subdivided into the customary lots, blocks and streets may be approved by the Planning Commission if, in the opinion of the Planning Commission, any departure from the foregoing regulations can be made without destroying the intent of the regulations. Plans for all such developments shall be submitted to and approved by the Planning Commission and may be approved subject to conditions set forth by the Commission. A comprehensive group housing development shall not be acceptable within this variance unless situated on 3 acres of land.

SECTION 900 PENALTIES
900.1 Any person, firm, or corporation *using an unapproved and unrecorded plat in the sale of subdivided land or violating any of the terms or provisions of these subdivision regulations shall be guilty of a misdemeanor* and, upon conviction, shall be punished by fine of not more than $100.00 or imprisonment of not more than 10 days or both fine and imprisonment. Each violation and each day of failure to comply with the provisions of this ordinance shall constitute a separate violation.
900.2 Any person aggrieved at any final decision of the Mayor and City Council approving or disapproving a plat may appeal therefrom to the Circuit Court of Columbus, Mississippi within the time and in the manner prescribed by Section 1195 of the Mississippi Code of 1942, as amended.

SECTION 1000 PROHIBITION
1000.1 The City of Columbus is hereby prohibited from accepting, improving, grading, paving, or lighting any street and from laying or authorizing the laying of any water mains, sewers, or other utilities in any street *except an existing public street, a street shown on an approved land subdivision plat, or a street legally established by the City of Columbus.*

ber 1969 the Southern Standard Building, Housing, Plumbing and other Codes recommended by the Planning Commission. During this same period of time, professional experts employed by the City were studying, for later submission to the Planning Commission, land use maps and zoning regulations to be adopted as the final stages of a comprehensive city plan.

In January or February 1970, Housing, Inc., gave a verbal option to Lancaster to purchase for $75,000 the disputed property, on which Housing, Inc., had made the aforementioned improvements, including the undedicated blacktop road that extended southerly across Lee Park for 17 feet to join Park Circle Drive. Housing, Inc., knew that Lancaster intended to use the property for a multi-housing project, and it expected to be employed by Lancaster as the actual builder. Lancaster on February 9 applied to Bailey Mortgage Company and FHA for § 236 mortgage financing to construct the North Hill Square Apartments, a project consisting of various buildings containing 70 one, two and three-bedroom rental apartments. FHA on March 27 executed its feasibility letter for an insurable mortgage not exceeding $943,600, conditioned upon construction of the project commencing not later than June 30, 1970.

Lancaster employed Terry Thomas, engineer and architect, to prepare building plans and specifications but he did not, directly or through representatives, submit them to the Planning Commission for its consideration or approval. Neither Lancaster nor Housing, Inc., sought permission from the municipal governing authority for access across Lee Park for the multi-housing project. Moreover, Engineer Thomas, relying upon Housing, Inc.'s survey made in 1967, was aware that there was no apparent access to Park Circle Drive other than by crossing a portion of Lee Park. Although he knew the plat of Forest Glen Subdivision was unrecorded, the engineer made no inquiry regarding access to the site or whether the street Housing, Inc., built and which he had observed on the ground had been legally dedicated or established as a public street. No public use had been made of this newly constructed street since it led to vacant property.[10]

Lancaster on May 8 applied to the city building inspector for a permit to build a "68 unit-apartment bldg. (2–1 br.)". This application was accompanied by preliminary plans (Ex. 59) and specifications (Ex. 58) made by Thomas. Thomas' preliminary plans, made before completion of his topographic survey, showed 17 separate buildings with their tentative location on the site. After cursory inspection, the plans were approved by T. H. Crigler, building inspector, who relied upon Thomas' certificate that the project complied with applicable building codes and regulations and its construction would be supervised by him. The building permit was on May 15 issued by J. D. Holloway, city tax collector, after certain deficiencies were corrected.[11] Completing his topographical survey on June 15, Thomas prepared final plans, submitted to FHA but never

---

1000.2 *No building permit may be issued by the City of Columbus for any structure on a lot not fronting on one of the above types of approved streets.* (Emphasis added)

10. It was not until June 19, 1970, that Housing, Inc., tendered to the City a right-of-way deed attempting to dedicate its previously constructed street to public use, but by that date a full-blown controversy had developed and the municipal authorities refused to accept the conveyance.

11. These corrections included (1) a sworn statement from Lancaster's engineer certifying that the plans and specifications conformed to applicable laws as to egress, type of construction and structural requirements of the governing building codes; and (2) a plot plan showing the offstreet paved parking spaces in accordance with the ordinance for offstreet parking. Although Holloway was instructed by the Mayor and City Council to see that all regulations were complied with, neither he nor Crigler observed the pertinent requirements of §§ 701.2, 1000.1 and 1000.2 of the subdivision regulation.

filed with the City, which showed the exact location of the various buildings and also added an eighteenth building.

Meanwhile, in late April, homeowners began objecting to the proposal and sought to delay the project until the City adopted a zoning ordinance. The Planning Commission, at its meetings on May 6, 13, 20, 27, and June 3 and 10, attended by Lancaster and Ben Chilcutt, discussed in great detail various aspects of the proposed zoning ordinance and uses of land but took no affirmative action upon the Lancaster project.[12]

Preparatory to loan closing, Lancaster obtained letters from city officials certifying to Bailey Mortgage Company and FHA that there were no applicable zoning ordinances, that the plans for the North Hill Square project complied with all local ordinances and city requirements, and that adequate city-supplied water, sewer and electrical service was available. The mortgagee and FHA were, however, made aware of the street access problem, which they resolved on the basis that Lee Park was city-owned property and the defect was one which the title insurance company was willing to insure. Even so, Thomas, Lancaster's engineer, certified to FHA that he had made an accurate survey of the property and that there were no applicable zoning or other municipal regulations affecting the use of the surveyed premises.[13] Housing, Inc., on June 27 deeded the property to Lancaster, reciting payment of a valuable consideration.[14] On June 29 Lancaster executed to the mortgagee loan documents for $947,300, and the FHA regulatory agreement. At FHA's suggestion, he also executed a construction contract with his wife, Margaret R. Lancaster, as general contractor to avoid the necessity for making an owner's performance bond and to meet other FHA requirements.

On June 30 an initial loan closing was held at Jackson, Mississippi, when FHA, having been supplied with all necessary documents, insured Bailey Mortgage Company's first advance of mortgage proceeds.[15] FHA officials chose to ignore notice of the developing controversy concerning access to the project. Bailey Mortgage Company immediately disbursed to Lancaster the first advance, but at the direction of the title insurance company, most of the money was placed in escrow with the mortgagee because of commencement of suit by homeowners to block the project.[16]

In early July, Housing, Inc., principal subcontractor, began clearing the building site and staking out building locations. Before actual construction could begin, however, and without notice, a group of citizens, principally homeown-

12. At its May 6 meeting the commission took no action upon the suggestion of a member that the commission "adopt a resolution requesting a moratorium calling for a delay of apartment building in single family sections until after the adoption of the city zoning ordinance."

13. After the title insurance company was advised of the threat of "legal action to invoke a reversionary clause in the deed of conveyance to Lee Park * * *, thereby threatening to curtail or eliminate access"; it required Lancaster to execute an indemnity agreement as a condition for its issuing the mortgagee's title policy. The title insurance company made no further inquiries regarding the matter.

14. At trial it developed that Housing, Inc., was still holding uncashed Lancaster's check for $75,000 to cover the purchase price under an agreement to rescind the sale if the housing project failed to materialize.

15. This advance was to cover the immediate payment by Lancaster of the following items:

| | |
|---|---:|
| 1st year's FHA Mortgage Insurance Premium | $ 4,736.50 |
| FHA Examination Fee | 2,841.90 |
| FHA Inspection Fee | 4,736.50 |
| Initial Service Charge | 18,946.00 |
| Title & recording expense | 2,300.00 |
| FNMA Fee | 16,577.75 |
| Legal and organizational | 6,225.00 |
| Architect's fee | 30,389.00 |
| Cost available for land | 58,596.00 |
| | $145,348.65 |

16. The mortgagee presently holds in escrow $124,508.75; the only paid items are FHA fees, title insurance, recording and attorneys' fees, totaling $20,839.90.

ers and other persons residing in the area, appeared in Lee Park and physically occupied that portion of parkland on which Housing, Inc., had previously constructed the access street. This virtual blockade to the building site interrupted all construction activity, making it impossible for the contractor's equipment to reach the site. This utilization of the park was maintained both day and night. Lancaster and Housing, Inc., appealed to the City for police protection; city police were in the Park at all times; there was no violence or disorderly conduct; no affidavits were filed and no arrests were made. The citizens' effort was so organized that regular 24-hour shifts were daily maintained over a period of several months—July to October—until this court issued its preliminary injunction to preserve the status quo.

After litigation began, the Planning Commission continued to discuss the proposed zoning ordinance at its meetings but deferred taking any position on the Lancaster project. The Mayor and City Council on December 15, 1970, adopted an ordinance zoning all property within the city limits, by the terms of which the Lancaster property was zoned R–1, Single-Family Residential District.

The evidence showed that at different times during past years, the owners of at least eight residences have installed private driveways over park land to Park Circle Drive.[17] While these driveways were installed without specific authorization by the municipal governing authorities, no official objection was ever registered to this known use of park property.

The homeowners opposed the housing project in the belief that it would depreciate the value of their residences and was incompatible with the immediate neighborhood. They also objected to the access street connecting with Park Circle Drive for fear that the relatively narrow park drives were inadequate to accommodate the congested traffic ensuing from

the multi-housing project, and that Lee Park might be otherwise affected adversely.

II.

The parties have advanced a veritable multitude of diverse and far-ranging arguments in support of their respective contentions. This argumentation can be reduced to three central issues which are framed as follows: (1) Was the building permit for the North Hill Square project issued in violation of local law, and, if so, may the City now seek its cancellation or is it estopped to do so? (2) Is there lawful access across Lee Park to Lancaster's building site, and, if not, may the park be nevertheless used by Lancaster as a private way since certain homeowners have been allowed to use a portion of park property for private driveways? and (3) May the homeowners and the city question HUD's decision to insure Lancaster's mortgage, and, if so, should the agency's action be invalidated and set aside? While the third issue involving federal statutes and regulations presents a federal question, the first two issues raise state questions controlled by the applicable law of Mississippi which we shall consider first.

(a) *Validity of Building Permit*

■■ A municipality has the discretionary authority, through its governing body, to adopt building codes and subdivision regulations which are distinct in character from zoning ordinances. Berry v. Embrey, 238 Miss. 819, 120 So.2d 165 (1960). Building codes as well as a comprehensive subdivision regulation which the governing authority of Columbus had enacted were in force at the time Lancaster applied for a building permit, and the validity of the building permit is dependent upon the requirements of those regulations. Since these municipal ordinances are reasonable, a point which Lancaster does not challenge, they are enforceable in the courts. Jones v. City

---

17. These properties are identified as Bozeman, Bussell and Atkins (northwest segment), Haggard and McHarg (northern segment) and Holland, Dale and Wise (southeast segment).

of Hattiesburg, 207 Miss. 491, 42 So.2d 717 (1949).

Lancaster contends that in obtaining the building permit he substantially complied with all City requirements but even if there were irregularities in connection with its issuance, the City is estopped from voiding the permit or having it declared invalid in these proceedings. The City and homeowners counter that the permit was obtained contrary to the express provisions of the building code as well as the subdivision regulation, that Lancaster and his agents made material misrepresentations to obtain the permit, and the city and homeowners are not estopped from seeking its cancellation. Although the City asserts that Lancaster and his engineer failed to comply with salient features of the building code,[18] it is not necessary for us to scrutinize the detailed provisions of the building code to conclude that the permit was issued under highly irregular conditions. It is clear from the evidence that material provisions of the subdivision regulation having direct bearing on a multi-housing project were ignored not only by Lancaster and his engineer in their efforts to secure the permit but also by the subordinate city officials, Holloway and Crigler, in granting it. No attempt was made to submit the North Hill Square project, which envisioned the construction of 18 buildings on a single site, to the Planning Commission for approval, and the project never received approval in the manner required by § 701 of the regulation. The regulation contained stated penalties for noncompliance. § 900.1 made it a misdemeanor to violate any of the terms of the regulation, and the city officials were expressly forbidden by § 1000.2 to issue a building permit for building on a lot which did not front on an existing or legally establish-ed public street or on a street shown on an approved land subdivision plat. Thus, Lancaster's plans not only contemplated building numerous structures on one site but also erecting them on property served by an undedicated private way which did not connect with a public street.

■ The essential facts are that the street which Housing, Inc., had laid out on the Lancaster property had not been dedicated to public use inasmuch as the 4.09 acre tract had never been subdivided and wholly remained private property. The street improvement made by Housing, Inc., during the period of its ownership could not qualify any portion of the street as an "existing or legally established public street" for the reason that the City neither accepted any dedication of it nor maintained or otherwise exercised any jurisdiction over the way, and there was no general public use of it. Additionally, no permission was validly obtained from the City's governing authority to utilize Lee Park in crossing from the Lancaster property to Park Circle Drive, which was the nearest public street. The established case law in Mississippi is that a street which has never been dedicated to nor accepted by the municipal authorities as a public street, and the municipal authorities not maintaining or otherwise exercising jurisdiction over it, remains a private street, in the absence of general and long-continued use by the public amounting to prescriptive easement. Albright v. Baker, 213 Miss. 234, 56 So.2d 703 (1952); Quin v. Northside Baptist Church, 234 Miss. 51, 105 So.2d 151 (1958). Clearly, Lancaster's multi-housing project would not be served by a public street, which was a prerequisite to the issuance of a lawful building permit.

In granting the building permit, Holloway, the issuing officer, failed to com-

18. It is urged that Thomas' preliminary drawings were not drawn to scale and the specifications as filed did not disclose the quality of materials to be used with requisite specificity, as required by Building Code § 103.3, nor did they locate all or any of proposed buildings on the site, as required by § 105.4; also, that § 105.6 (b), which allows the building official to accept the certificate of a registered engineer as to compliance, was violated by Thomas' false statements that the plans submitted conformed to the law as to egress, type of construction and general arrangement.

ply with mandatory provisions of the municipal ordinance which directly affected use of the property, and being unauthorized, the permit was mistakenly issued. In the absence of precedent to the contrary, we believe the state courts of Mississippi would follow the general rule that "a building permit issued in violation of law or under a mistake of fact confers no right, and may be revoked upon discovery of the error, even after building operations have begun." 13 Am. Jur.2d, Buildings, § 11, p. 276; 62 C.J.S. Municipal Corporations § 227(7), p. 521. We thus hold that the permit was invalid and would not authorize Lancaster to use his property in a manner that violated a duly enacted and legally operative municipal ordinance, unless we, as a court of equity, should be persuaded that the City is estopped from insisting upon compliance because of the circumstances confronting Lancaster, Housing, Inc., and the other parties identified with their interests in the case.

Lancaster, Bailey Mortgage Company and FHA urge that the City is equitably estopped from raising the invalidity of the building permit because they relied upon representations by city officials that the plans for the multi-housing project complied with local law and were thereby induced to enter into contracts to build and finance the structures authorized by the building permit.[19] The City counters that estoppel may not be invoked against a municipality in the performance of a governmental function, and also that eq-

uitable estoppel should not arise under the circumstances because of the concealment and misrepresentations of material facts by Lancaster and his engineer to secure the permit, some notice of which was imparted to the lender and FHA prior to the loan closing.

■ The Supreme Court of Mississippi has had frequent occasion to consider whether the doctrines of estoppel and equitable estoppel are applicable to a municipal corporation.[20] Ordinarily the unauthorized acts of one of its officials does not estop a municipality acting in its governmental capacity, and this rule has been followed by the Mississippi courts for many years.[21] The Mississippi decisions recognize, however, that "in a proper case" equitable estoppel may apply to a municipality, but the Court has consistently declined to state any rule of general application, pointing out that each case in which equitable estoppel is pleaded should be controlled by its own facts.[22] In *Witherspoon*, the court stated:

"There may be cases where we would not hesitate to use the beneficent doctrine of estoppel in pais against a municipality. We can imagine such a case, but this is not one."

■ ■ Nor does it clearly appear from the Mississippi cases that equitable estoppel applies only to proprietary and not governmental functions, which is a distinction drawn by some courts. The issuance of a building permit pursuant

---

19. Building inspector Crigler advised the mortgagee and FHA as follows:

"We are pleased to advise that from an investigation of the plans for construction of the North Hills Square Apartments in Columbus, Mississippi, Project No. FHA 065 44003 LD, that the plans comply with all local and state laws, ordinances and city requirements pertaining to standards and regulations for construction, including, but not limited to, all applicable zoning regulations for the City of Columbus."

20. The state Supreme Court has approved the modern definition of estoppel as: "The preclusion of a person from asserting a fact, by previous conduct inconsist-

ent therewith, on his own part or on the part of those under whom he claims, or by an adjudication upon his rights, which he cannot be allowed to call in question." Reliance Mfg. Co. v. Barr, 245 Miss. 86, 146 So.2d 569 (1962), citing 31 C.J.S. Estoppel § 1, p. 192.

21. American Oil Co. v. Marion County, 187 Miss. 148, 192 So. 296 (1939); Colle Towing Co. v. Harrison County, 213 Miss. 442, 57 So.2d 171 (1952); Reliance Mfg. Co. v. Barr, supra.

22. Witherspoon v. City of Meridian, 69 Miss. 288, 13 So. 843 (1891); Reliance Mfg. Co. v. Barr, supra; Delta Construction Co. of Jackson v. City of Jackson, 198 So.2d 592 (Miss.1967).

to a municipal ordinance has been classified as a governmental and not a proprietary function.[23] Nevertheless equitable estoppel, even where the city acts in a proprietary capacity, may be invoked "only on the clearest showing of the right to relief by the plaintiff in equity, and if the case be doubtful, the doubt must be resolved in favor of the public." Mississippi Power Co. v. City of Starkville, 4 F.Supp. 833 (N.D.Miss. 1932). The stringent requirement of the principle has been stated in these words:

> " * * * [A]n estoppel *in pais*, as distinguished from an estoppel of record, is such as will arise from acts and declarations of the party sought to be charged who designedly induces another to alter his position injuriously to himself. Moreover, where the doctrine is sought to be applied, it is necessary that the party in whose favor it is invoked must also act in good faith." Delta Construction Co., 198 So.2d at 600.

And although the essential elements of representation, reliance, and change of position may be present, equitable estoppel arises only where manifest inequity would result except for the doctrine's application, Izard v. Mikell, 173 Miss. 770, 163 So. 498 (1935), and the doctrine is to be applied cautiously and only when equity clearly requires it. Bright v. Michel, 242 Miss. 738, 137 So.2d 155 (1962).

When measured against the foregoing background of equitable principles, the arguments for invoking equitable estoppel against the City of Columbus fall far short of the mark. The evidence does not show that the governing body had knowledge of or acquiesced in the representations made by subordinate city officials that the project complied with local law. More fundamentally, Lancaster, in his capacity as chairman of the Planning Commission, had personal knowledge of the requirements of the subdivision regulation and knew that they had not been complied with in that the plans for his large-scale housing development had not been approved by that body. This requirement could not be brushed off as inconsequential or ignored at the will of the chairman, and the negligent failure of Crigler and Holloway to enforce it may not excuse his failure, through either negligence or design, to submit the project to the Planning Commission.[24] He could not subordinate his duty as a public officer to his private interest. It is no answer to argue that obtaining the Planning Commission's approval was meaningless, for it was mandatorily required in the administration of an important ordinance.[25] Moreover, Lancaster is charged with responsibility for the act of his engineer, who, although knowing or having the means of knowing the serious question regarding street access, nevertheless incorrectly certified to city officials as well as FHA and the mortgagee that access existed across Lee Park. The evidence shows that FHA and Bailey Mortgage Company, prior to the loan closing, were timely informed of the questioned access but chose to ignore the problem in their decision to abstain from further inquiry and proceed with the loan closing.

Practically all the expenditures at the building site had been made by Housing, Inc., when it proposed to use the property as a subdivision, and, antedating the building permit, they may not form a basis for estoppel.[26]

---

23. See cases cited 31 C.J.S. Estoppel § 142, p. 421, fn. 29.

24. Lancaster's argument that the subdivision requirement should be waived as to his project since another developer of a group housing project was issued a building permit without Planning Commission approval is untenable.

25. Housing, Inc., officer Ben Chilcutt, also a member of the Planning Commission, had direct knowledge the multi-housing project could not be built upon the Lancaster site except with the approval of the Planning Commission.

26. Had Housing, Inc., adhered to its original plan for use of the property, as preliminarily approved by the city governing

■ ■ Because of the unique and special circumstances presented, we are unable to conclude that equity requires that the parties who invoke equitable estoppel are entitled to the protection of that beneficent principle. As a practical consequence, estopping the City from attacking the building permit will redound chiefly to the benefit of Lancaster, whose conduct is directly responsible for his present plight. It is one of the oldest maxims of the law that "no man shall, in a court of justice, take an advantage which has his own wrong as a foundation for that advantage." [27] In a recent case the state Supreme Court has stated this maxim is "not to be lightly considered and brushed aside. It is the duty of the Court to apply it of its own motion when it becomes evident that the facts are such that they call for the application of the maxim. Griffith, Miss. Chancery Practice § 42 (1950)." [28]

■ Aside from state grounds, counsel for Lancaster and Housing, Inc., claim that the City should be estopped to challenge the housing project because they assert the real opposition is based on racial bias and the City, by attempting to revoke the permit, is seeking to perpetuate discriminatory designs of the homeowners, contrary to the Fourteenth Amendment, and they cite Dailey v. City of Lawton, 425 F.2d 1037 (10 Cir. 1970), and Kennedy Park Homes Association, Inc. v. City of Lackawanna, 436 F.2d 108 (2 Cir. 1970), cert. den. 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971), as authority for this position. These cases are inapposite for the reason that there is absolutely no evidentiary support for the notion that the homeowners' objection to the housing project is racially motivated or that the City's insistence upon compliance with its valid and nondis-criminatory ordinance has unconstitutional overtones. We, therefore, reject the wholly unfounded notion that this case is in any way intertwined with the Civil Rights statutes or policies of the United States and hold that equitable estoppel cannot be availed of as a defense to setting aside the invalid building permit.

(b) *Access Across Lee Park.*

A separate issue from the validity of the building permit is Lancaster's claim that he was tortiously denied right of access to his property by the organized activities of the homeowners who occupied Lee Park and blocked entry to the building site. This claim rests upon a determination of whether Lancaster and his agents had a vested right of access across the 17 foot portion of Lee Park which separated his property from Park Circle Drive.

■ By Blewett Lee's 1916 conveyance, Columbus was restricted to using that portion of Lee Park in question only for specific purposes, to-wit: (1) a public park; (2) public roads or streets, drives and walks; and (3) right-of-way for a streetcar or traction railroad (Fn. 5). [29] The dedicator, by this second gift, clearly intended to provide the general public with means of access to enjoy the park area. It is settled state law that lands taken and held by a municipality as a gift for a specific purpose are subject to the law of trusts, and any use inconsistent with that intended by the dedicator constitutes a breach of trust. Rowzee v. Pierce, 75 Miss. 846, 23 So. 307 (1898); Jones v. Mayor and Board of Aldermen of the City of Jackson, 104 Miss. 449, 61 So. 456 (1913); Board of Mayor and Aldermen of Yazoo City v. Wilson, 232 Miss.

authority in October 1967, and then been denied building permits for single-family dwellings after making its expenditures, a much better case for estoppel would be present.

27. Crabb v. Comer, 190 Miss. 289, 200 So. 133, 135 (1941); Patterson v. Koerner, 220 Miss. 590, 71 So.2d 464 (1954);

Thigpen v. Kennedy, 238 So.2d 744 (Miss. 1970).

28. Thigpen v. Kennedy, 238 So.2d at 746–747.

29. The evidence indicates that no streetcar or traction railroad was ever constructed in the park.

435, 99 So.2d 674 (1958). In *Rowzee*, lands dedicated for use only as an ornamental park could not be used by the Town of Pontotoc as the site of a public school. In *Jones*, the City of Jackson was not permitted to erect a public library in Smith Park, which the legislature had dedicated as a commons or promenade. In *Wilson*, lands dedicated as a public park could not be converted by Yazoo City into a playground for a public school. Unquestionably a municipality has more discretionary authority in the public uses of property which it purchases for a park than where the park land has been dedicated without cost. This distinction was clearly drawn in City Council of Greenville & Miss. Power & Light Co. v. Thomas, 241 Miss. 633, 131 So.2d 659 (1961), where the City purchased a tract of land, paying a valuable consideration, for a park and the conveyance did not expressly limit the use of the land to park purposes only. Holding that the City of Greenville could allow a portion of the park to be used for a city street and erecting of power lines by a public utility, the Court declared:

"We think there is a difference between the dedication of a park under circumstances which create a trust and the purchase by a municipality of land for use as a park. In 39 Am.Jur., Parks, etc., Section 21, p. 816, it is stated as follows: 'The extent to which the use of park property may be changed is governed, to some extent, at least, by a consideration of the manner in which the property was acquired, whether by dedication by the owner or purchase or condemnation by the municipality.'

For instance, the case of Board of Mayor and Aldermen of Yazoo City v. Wilson, 232 Miss. 435, 439, 99 So.2d 674, is not applicable here, for in that case there was a dedication of the park without consideration to the dedicator. The land in the present case was purchased for value but the words contained in the deed with reference to the use to which the lands were to be put by the city were not sufficient to create a condition subsequent." (131 So.2d at 664)

Since Columbus is obligated as trustee to hold Lee Park as a public park, with power only to lay out *public* streets, drives and walks, it cannot lawfully allow any portion of the land to be diverted to any public purposes other than those specified or to any private use, no matter how small it may be. Mississippi cases compel this conclusion, and they leave no room for invoking the principle of *de minimis non curat lex* to allow Lancaster's private encroachment of a 17 x 20 foot area of park land. The correct construction of the grant denies any authority of power to the City to grant access across the park lands for private benefit, and this would be dispositive of the issue unless we may determine that there exists a special right of access for an owner of property abutting Lee Park.

■ Since the evidence clearly indicates that Columbus' governing body never formally accepted or otherwise recognized Housing, Inc.'s street improvement as a public street, Lancaster's claim of lawful access across the 17 foot strip of park land depends upon his status as an abutting property owner. First, he asserts a vested right of access across the park because a portion of his land in 1948, when it was owned by Eatherton, was assessed with taxes to pay for paving Park Circle Drive and the City, therefore, cannot deny him access. Park Circle Drive does not in fact adjoin any portion of the property presently owned by Lancaster, and park land intervenes. Lancaster cannot qualify as a property owner abutting the public street in the enjoyment of his property. A case in point is Warwick v. Pearl River Valley Water Supply Dist., 246 So.2d 525 (Miss. 1971), cited by Lancaster's counsel, which held a 100 foot strip of land owned by the Water Supply District that intervened between Warwick's property line and a public road prevented Warwick from being an abutting property owner having a vested right of access to the public street. Thus, while any special

assessment taxes paid by Lancaster's predecessors in title might be recoverable under mistake of fact, the mere erroneous street assessment could not endow Lancaster's building site with attributes of property abutting a public street.

 A more serious claim asserted by Lancaster is that the law should imply access in his favor across Lee Park as a necessary enjoyment of his private property abutting a public park, and he points to the state's established judicial policy of upholding ways of necessity from isolated parcels of land to public roads as being essential to the owner's enjoyment of property.[30] State statutory law expressly recognizes that ways of necessity over private property may be obtained, upon payment of due compensation, in specialized proceedings applicable only to rural lands.[31] In *Warwick*, the state Supreme Court extended the principle to imply a way of necessity across public property, and in doing so was heavily influenced by the state's constitutional and legislative provisions, and also by the fact that Warwick's property was completely surrounded, or "landlocked", by property of the Water Supply District and there was no access to his property other than across the lands of the District.

Lancaster's reliance on the limited principle of *Warwick*, however, is misplaced since that case has clearly distinguishable facts. *Warwick* involved rural lands, not city property, which is expressly exempt from the provisions of § 110 of the state constitution. Warwick's property, prior to condemnations by the Water Supply District, was served by one public road, access to which was completely cut off by the District's taking, making it an absolute necessity to gain access to another public road no more than 100 feet distant from the property line. In the instant case, only the southern boundary of Lancaster's property abuts Lee Park, and it was never lawfully connected with a public road. Although using the 17 foot strip of park land might be more convenient, the evidence clearly shows that such is not a necessity, as required by *Warwick*. Lancaster's 4.09 acre plot is not land-locked, for at its northeast corner the property opens upon an unimproved but dedicated street leading into Billups Avenue. If that way is not usable, Lancaster might claim a way of necessity across other lands owned by his grantor's predecessors-in-title. For example, the law would recognize a way of necessity across Eatherton's remaining lands which directly abut Park Circle Drive, as arising on an implied grant if Eatherton conveyed a part of his land to Housing, Inc., in such manner as to shut it off from access to a road to the outer world. Pleas v. Thomas, supra; 25 Am.Jur.2d, Easements and Licenses, § 34, p. 447; 28 C.J.S. Easements § 36, p. 699. The *Warwick* court cited the latter texts with approval.

---

30. Quin v. Sabine, 183 Miss. 375, 183 So. 701 (1938); Board of Supervisors of Lamar County v. Elliott, 107 Miss. 841, 66 So. 203 (1914); Pleas v. Thomas, 75 Miss. 495, 22 So. 820 (1897).

31. Miss.Code Ann. § 8419. How private way may be established.

When any person shall desire to have a private road laid out through the land of another, when necessary for ingress and egress, he shall apply by petition, stating the facts and reasons, to the board of supervisors of the county, which shall, the owner of the land being notified at least five days before, determine the reasonableness of the application; and, if the petition be granted, the same proceedings shall be had thereon as in the case of a public road; but the damages assessed shall be paid by the person applying for the private road, and he shall pay all the costs and expenses incurred in the proceedings.

The constitutional base for this statute is Miss. Constitution 1890, § 110:

The legislature may provide, by general law, for condemning rights of way for private roads, where necessary for ingress and egress by the party applying, on due compensation being first made to the owner of the property; *but such rights of way shall not be provided for in incorporated cities and towns.* (Emphasis added)

Either of the alternative ways plainly suggested by the evidence obviates any need of reaching the equitable considerations applied in *Warwick*. It is not our duty in this case to make a judicial selection of the route of access. It is sufficient for us to hold that a way of necessity does not arise by implication if the claimant has another mode of access to his property, however inconvenient, either by another way over his own land or by a right-of-way over the land of another. 25 Am.Jur.2d, Easements and Licenses, § 38, p. 451. These considerations impel us to reject Lancaster's claim that he was denied a vested right of access across the 17 foot area of park land.

 Finally, we are unpersuaded by the plea that Lancaster cannot be denied access across Lee Park inasmuch as the City has knowingly acquiesced in a policy of allowing other abutting property owners to construct private driveways from their residences across Lee Park to connect with Park Circle Drive. While the evidence indicates that there are eight such driveways and most have existed for many years, it is not disclosed whether all or any of the private roads are ways of necessity, or what might be the precise source of their origin such as the history of the titles to the property they serve or other factors of possible legal significance. Surely, if the other private roads which cross park property merely serve the convenience of the respective abutting property owners and are not based upon a legally cognizable right—a point on which we presently express no opinion—such private use of the park property would be unauthorized and violative of the dedication. An unauthorized use of the park property, no matter how long continued, can bestow upon the user no claim whatever upon the park; and it is nothing more than a revocable license. The City's obligation as trustee is to see that

no portion of Lee Park which was conveyed to it in trust is diverted from the uses for which it was dedicated, and an estoppel cannot be invoked against it in favor of one seeking a private benefit merely upon a showing that the City may have been derelict in its fiduciary duties. Also, if the City has, in fact, failed to protect Lee Park against private encroachment, mere inaction would not give rise to a federally-protected right for which Lancaster can seek redress as a denial of equal protection of the laws or infringement of other constitutional guaranties. We conclude that Lancaster has established no right of access across the 17 foot strip of park land and the use of that area by the homeowners did not invade his rights, and his claims against the homeowners and City officials for damages, unlawful conspiracy, and other wrong, must fail.

### (c) *FHA Commitment to Insure Mortgage.*

A third distinctive issue relates to the challenge by the City and homeowners to the validity of FHA's contract to insure Lancaster's mortgage, more specifically the commitment to insure the initial advances made June 30, 1970. This challenge is based upon alleged misrepresentations made to FHA officials by Lancaster and his agents and also FHA's failure to comply with various regulations issued by HUD under the National Housing Act, 12 U.S.C. § 1715b. HUD counters with three alternative defenses: (1) The decision of its statutory agent is not subject to judicial review; (2) the challengers lack standing to attack the agency decision; and (3) the agency decision was not arbitrary, capricious, an abuse of discretion or contrary to law, and therefore must be upheld.[32]

Although the pleadings place in issue the validity of FHA's insuring agree-

---

32. Evidence of alleged irregularities was admitted at the trial over objection of HUD and Lancaster in a bench ruling that the FHA decision was subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and the City of Columbus, if not the homeowners, had standing to seek review under 5 U.S.C. § 704.

ment,[33] we are persuaded that the entire question has been mooted for our judgment upon it would have no practical effect upon the existing controversy. The City on December 15, 1970, adopted a comprehensive zoning ordinance applicable to all property within its corporate limits, and by its terms Lancaster's property was zoned R–1—a single-family dwelling district. The Mississippi courts recognize that the classification of property for zoning is a legislative matter, and courts should not interfere with the classification in the absence of evidence that the municipal action is unreasonable, arbitrary, discriminatory or an abuse of discretion.[34] The zoning ordinance in the case *sub judice* was adopted after many months of professional consultation and study of, and extensive community participation in, the formulation of a zoning ordinance best suited for Columbus. Certainly this court is not a proper forum in which to debate its validity, either generally or as it may classify Lancaster's plot. In view of the court's ruling that the building permit which was issued on May 15, 1969, is invalid and must be cancelled, the property in question may not now be used for a multi-apartment project as Lancaster presently has no valid claim for continuing a nonconforming use. No advantage may be acquired from a use which was unlawful at the time the zoning regulation took effect. 101 C.J.S. Zoning § 188, p. 945.

Thus FHA's insuring agreement no longer affects the position of the City or the homeowners in any way, nor does its existence constitute an interference with any interest held by them which requires the use of judicial authority for protection. For all intents and purposes, the controversy between the parties has come to an end. Obviously, no purpose would be served by ruling on the validity of the insuring agreement since the subject matter of the insurance has failed, i. e., the FHA-approved project cannot be built. It is a settled legal principle that courts should refrain from making rulings that are merely hypothetical and devoid of practical effect upon an existing controversy. A case becomes moot when "by an act of the parties, or a subsequent law, the existing controversy has come to an end * * *" and a court is "not empowered * * * to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it." United States v. Alaska Steamship Co., 253 U.S. 113, 116, 40 S. Ct. 448, 449, 64 L.Ed. 808 (1920); Caldwell v. Craighead, 432 F.2d 213 (6 Cir. 1970), cert. den. 402 U.S. 953, 91 S.Ct. 1617, 29 L.Ed.2d 123; and Singleton v. Board of Commissioners of State Institutions, 356 F.2d 771 (5 Cir. 1966).

We find it unnecessary to pass on other contentions raised by the parties except to deny to all parties their respective claims for reimbursement of attorneys' fees and litigation expenses incurred; taxable costs in the consolidated actions, however, shall be assessed against Lancaster and Housing, Inc.

An Order shall be entered in accordance with this Memorandum Opinion.

---

33. United States v. Chelsea Towers, Inc., 295 F.Supp. 1242, 1247 (D.N.J.1967): "* * * The only insurance which was contemplated under the national mortgage insurance program was a guaranty by the Government that, if the mortgage falls into an unremedied default, the FHA will repay the mortgage-lender and succeed to its rights under the mortgage." United States v. Neustadt, 366 U.S. 696, 709, 81 S.Ct. 1294, 1301, 6 L.Ed.2d 614, 622 (1961):

"* * * [T]he mortgage insurance program was not designed to insure anything other than the repayment of loans made by lender-mortgagees; and that 'there is no legal relationship between the FHA and the individual mortgagor.'"

34. Fowler v. City of Hattiesburg, 196 So.2d 358 (Miss.1967); Adams v. Reed, 239 Miss. 437, 123 So.2d 600, 606 (1960); Ballard v. Smith, 234 Miss. 531, 107 So.2d 580 (1959).